NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LAWRENCE B. EBERT and REBECCA A. VARES-EBERT, | |
| Plaintiffs, | Civ. No. 15-7331 |
| v. | **OPINION** |
| TOWNSHIP OF HAMILTON, MAYOR KELLY A. YAEDE (in her official and individual capacity), JOHN DOE (I), and JOHN DOE (II), | |
| Defendants. | |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on a motion for summary judgment brought by Defendants Township of Hamilton (the "Township") and Mayor Kelly A. Yaede (collectively "Defendants"). (ECF Nos. 74, 76.) Plaintiffs Lawrence B. Ebert and Rebecca A. Vares-Ebert ("Plaintiffs") oppose. (ECF Nos. 78, 79.) The Court has decided the Motion based on the parties' written submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Defendants' Motion is granted in part and denied in part.

## BACKGROUND

This civil rights case arises out of steps taken by the Township Defendant to remove and dispose of items from the backyard of a house owned by Plaintiff Lawrence B. Ebert ("Mr. Ebert"). The following facts are undisputed, unless otherwise noted. Mr. Ebert owns a house at 1850 Greenwood Avenue, Hamilton, New Jersey (the "Property"). (Defs.' Statement of Material Facts Not in Dispute ("SMF") ¶ 3, ECF No. 76-1.) The backyard of the Property is surrounded

1

by six-foot-tall wooden fencing, so that one cannot look into the backyard from the street. (Vares-Ebert Decl. ¶¶ 14–16, ECF No. 78-1.) At all times relevant to the events described in the Complaint, a "No Trespassing" sign was posted on the fence. (*Id.* ¶ 17; *see also* Ebert Decl. ¶ 28, ECF No. 78-2.) The fence allowed access to the backyard via a gate, secured on the inside by a metal cross-bolt, locked hasp, and a wooden cross-bar. (Ebert Decl. ¶ 14.)

On May 28, 2014, the Township received an anonymous complaint that there was junk all over the Property. (*Id.* ¶ 2; *see also* Defs.' Ex. B, ECF No. 74-4 ("Junk all over property, including front porch and behind fence in back yard. Also grass is high.").)[1] After a same-day inspection, the Township issued a Notice of Violation to Mr. Ebert by certified mail on May 28, 2014, giving a compliance date of June 2, 2014. (Defs.' SMF ¶ 4; Defs.' Ex. C, ECF No. 74-5; Pls.' Resp. SMF ¶ 4.) Mr. Ebert received the Notice of Violation at his primary residence in Bridgewater, NJ on May 31, 2014. (Pls.' Resp. SMF ¶ 6; *see also* Defs.' SMF ¶ 9; Defs.' Ex. D, ECF No. 74-6.) The Township set a reinspection date of June 3, 2014. (Defs.' Ex. B.)

The Notice of Violation cited three conditions: high grass and weeds on entire property (especially behind fence); overgrowth of shrubs/bushes; and junk, rubbish, and debris, including couches on porch, all items behind fence, litter, bags, cups, etc. (Defs.' SMF ¶ 4; Defs.' Ex. C.) The Notice of Violation cited Chapter 66, Section 71, paragraph C of the Code of the Township

---

[1] The Township also notes that Mr. Ebert was on notice of the declining condition of the Property, because on March 16, 2014, Vincent and Denise Morton, the property owners at 1848 Greenwood Avenue, which shares a common dividing wall with the Property, sent a letter to Mr. Ebert regarding the decline and the need for repairs and upkeep related to, *inter alia*, overgrowth, unsafe conditions, and rodents and critter infestation. (*See* Defs.' SMF ¶ 1; Defs.' Ex. P, ECF No. 74-18; *see also* Ebert Decl. ¶ 11 (noting a conversation with Vince Morton about the presence of a rodent outside the building comprising 1848–1850 Greenwood Avenue).) Plaintiffs object to this exhibit as irrelevant (what existed in March is not indicative of what may have existed in May or June), unauthenticated, produced post-discovery, and therefore inadmissible. (Pls.' Resp. SMF ¶ 1, ECF No. 78.) Because this letter is not material to the present Motion, the Court will not discuss it further.

of Hamilton. (Defs.' Ex. C; Defs.' SMF ¶ 5; Pls.' Resp. SMF ¶ 5; *see also* Defs.' Ex. R, ECF No. 82-3.) It further stated, in all capitals, "If Notice is not complied with [by] the due date, work will be done by the Township of Hamilton and the cost of same applied to your tax bill Chapter 110-34." (Defs.' Ex. C (capitalization omitted); *see also id.* ("Please be advised that on the 2nd occurrence of this violation, there will be no Notice of Violation—a summons or workorder may be issued" (capitalization omitted)"); Defs.' SMF ¶ 7.)[2] The Notice twice mentioned that the cited conditions violated the "Housing Code, Sanitary Code, Plumbing Code, or other ordinances in force in the Township of Hamilton or of statutes pertaining to Health of the State of New Jersey." (Defs.' Ex. C.) The header of the Notice indicated it was issued by the "Division of Health – Township of Hamilton" and named J. Robert Decillis, Public Health Investigator, and provided his phone number. (*Id.*)

According to the Township's records, on June 4, 2014, because the resident was mailed the violation notice and did not comply, a work order and lien on the property was requested. (Defs.' Ex. B.) However, on June 5, 2014, Plaintiff Rebecca A. Vares-Ebert ("Ms. Vares-Ebert"), Mr. Ebert's wife, appeared in person at the Township's Health Department to speak with someone about the Notice of Violation and request an extension of time to comply. (Defs.' SMF ¶¶ 10–11; Pls.' Resp. SMF ¶¶ 10–11.) After that conversation, in the afternoon of June 5, 2014, the Township ordered a stop on the workorder until further notice because "Rebecca (owner) stopped in and spoke to Jeff and . . . Jeff granted an extension until Thursday June 12th[.]

---

[2] The text of the ordinances has been produced by the parties. (*See* Defs.' Ex. L, ECF No. 74-14 (Chapter 110, Article II, Sections 110-32–110-34 of the Hamilton Township Code); *see also* Defs.' Ex. R, ECF No. 82-3 (Chapter 66, Article III, Section 66-71 of the Hamilton Township Code); Pls.' Ex. 1 ("Relevant Hamilton Ordinances"), ECF No. 79-1 (excerpts from Sections 66-71 and 66-66 of the Hamilton Township Code).)

I will do re inspection Friday morning June 13[th][.]" (Defs.' Ex. B (capitalization altered) (comments in Township service request database).)

An employee of the Township's Health Department then met with Ms. Vares-Ebert on the Property to discuss compliance. (Defs.' SMF ¶ 12.) Ms. Vares-Ebert again appeared at the Township's Health Department, and a Township employee again came to the Property to meet with Plaintiffs and review the details related to the conditions cited in the Notice of Violation. (Defs.' SMF ¶ 13.) Plaintiffs aver that there were other meetings with Hamilton employees during this period, and that the Township's records are incomplete. (Pls.' Resp. SMF ¶ 12.)

On June 13, 2014, Health Department employee Rob Decillis re-inspected the Property. (Defs.' SMF ¶ 14; Defs.' Ex. B ("Rob Decillis went on re-inspection today. Resident has not complied. Processing work order.").) That same day, a Health Violation Mitigation Order was issued for the removal of junk, rubbish, and debris from the backyard of the Property after the re-inspection revealed non-compliance. (Defs.' SMF ¶ 15; Defs.' Ex. B; Defs.' Ex. F, ECF No. 74-8 (listing "litter, tires, bags, etc and items behind fence" as items to be removed by the Department of Public Works pursuant to the Health Violation Mitigation Order).) On June 24, 2014, Rob Decillis of the Health Department visited the Property again to check on Plaintiffs' progress. (Defs.' SMF ¶ 16.) Plaintiffs aver that they had substantially complied by this point, while the Township emphasizes that Plaintiffs had not fully complied. (*Compare* Pls.' Resp. SMF ¶ 17 *and* Ebert Decl. ¶ 27, *with* Defs.' SMF ¶ 17.)

On June 27, 2014, Mr. Ebert secured the gate of the backyard fence at the Property with a metal sliding bar, a hasp with lock, and a wooden cross-bar. (Ebert Decl. ¶ 5.) At that time, the gate was not broken. (*Id.*) On the morning of June 28, 2014, employees of the Township's Department of Public Works arrived at the Property to execute the Health Violation Mitigation Order. (Defs.' SMF ¶ 19.) The parties dispute how the Township accessed the backyard: Mr.

Ebert, who was not present when the workers arrived, avers that "employees of Hamilton Township broke through a locked gate, bearing a 'no trespassing' sign, which secured a wooden fence of height 6 [sic] feet" (Ebert Decl. ¶ 28), whereas—as memorialized in a police report—Mr. John Dileo, Road Supervisor for the Township Public Works Department, made a hearsay statement that "the wooden gate was unlocked and partially ajar" (Defs.' Ex. G, ECF No. 74-9).[3] (*See* Pls.' Statement of Contested Material Facts ("CMF") ¶ 3, ECF No. 79-4.)

The parties largely dispute the sequence of events on June 28, 2014. (*See* Pls.' CMF ¶¶ 5–6.) The police report, prepared by Township Police Officer Jordan Kostoplis, indicates that officers reported to the Property "on an assist agency" at 8:04 AM and observed a front-end loader removing debris from the rear yard of the residence through a side fence gate. (Defs.' Ex. G.) The front-end loader had a scoop attachment on the front and was loading debris into the back of a Township dump truck. (*Id.*)

The police report states "[t]he smell of rotten food could be smelled from the street in front of the residence." (*Id.*) Mr. Dileo, of the Public Works Department, likewise testified that while he was at the Property on June 28, 2014, he encountered a "nasty and stinking smell," although he could not pinpoint when exactly he first smelled the odor. (Defs.' SMF ¶ 20; *see also* Defs.' Ex. H, Dileo Dep. 70:14–25, ECF No. 74-10.) Plaintiffs contend that there was no smell emanating from the Property at any time on June 28, 2014. (Vares-Ebert Decl. ¶ 13; *see also* Ebert Decl. ¶ 30.) Plaintiffs' witness and neighbor Tammy Burnat likewise attests there was "no smell perceived by me" that morning. (Burnat Decl. ¶ 12, ECF No. 79-3.)

The police noticed the following items being removed from the rear yard of the residence: "rotten hams, rotten pork roast, rotten unknown pink meat, broken buckets, broken

---

[3] Defendants have furnished excerpts of Mr. Dileo's deposition testimony, which do not address his hearsay statement or how entry to the Property was obtained. (Defs.' Ex. H, ECF No. 74-10.)

pottery, empty soup cans, rotten wood, wrappers, and other unidentifiable items from trash pile." (Defs.' Ex. G; *see also* Defs.' SMF ¶ 21.) The Public Works employees also found a used hypodermic needle "in the rubble." (Defs.' Ex. G; *see also* Defs.' SMF ¶ 22; Defs.' Ex. I (division case report for syringe).) During the abatement, Mr. Dileo took pictures depicting the condition of the Property. (Defs.' SMF ¶ 19 (citing a portion of deposition testimony not produced); Defs.' Ex. J (thirty-two semi-color photographs); *see also* Ebert Decl. ¶ 29 (noting that Mr. Dileo took pictures during the work).)[4] The photographs depict piles of items strewn about the backyard, as well as some stacked chairs and upside-down trash bins, a wheelbarrow, and cement blocks; overall, the size, resolution, and coloration of the photos make it difficult to corroborate what items were present in the yard.

Mr. Ebert and Ms. Vares-Ebert arrived at the property separately on the morning of June 28, 2014. The police report reflects that Ms. Vares-Ebert arrived first, drove her vehicle over the curb, and spun her tires across the grass while recording with her cell phone through the windshield. (Defs.' Ex. G.) After getting out of the car, she was ultimately issued summonses for Reckless Driving 39:4-96 and for Improper Use of Cell Phone 39:4-97.3. (*Id.*) Mr. Ebert arrived second and also recorded the debris removal. (*Id.*) After speaking with a supervisor—Sergeant Schroeder—Mr. Ebert went into the residence, exited through the back door, and obstructed the front-end-loader from operating. (*Id.*)

According to the police report, Mr. Dileo stated he left non-nuisance items on the Property "such as [] patio furniture, patio blocks, propane tanks, lawn mower, and recycling

---

[4] Mr. Ebert repeatedly refers to the Township's "control" of the Property when the evidence of nuisance was discovered, in essence asking the Court to infer spoliation or that the Township planted evidence to justify the abatement post-facto. (*See, e.g.*, Pls.' Resp. SMF ¶¶ 19, 21, 22; Ebert Decl. ¶¶ 29, 31, 32 ("There is no evidence that there was a violation PRIOR to Hamilton involvement." (emphasis in original)); *see also* Pls.' Br. at 23, ECF No. 79.) The Court declines to make the requested inference or otherwise engage this line of argument.

buckets." (Defs.' Ex. G.) However, Plaintiffs assert some of these items were removed. (Pls.' CMF ¶ 6 (referring to "video clips [which] show that Officer Kostoplis knew that recycle buckets were being removed"); *see also* Vares-Ebert Decl. ¶¶ 19–20 ("I saw Hamilton Township employees remove vinyl siding, plants, various garden implements, and recycle barrels."); Ebert Decl. ¶ 9 ("As a recycle bucket was taken away, I asked Officer Kostoplis why they were taking the recycle bucket and he replied the recycle buckets are property of Hamilton Township. . . . Other non-nuisance items, such as a wheelbarrow, were removed by Hamilton Township.").)[5] Plaintiffs aver that, even "[a]ssuming arguendo the presence of some meat (origin unknown), . . . this comprised a few cubic feet of the thirty cubic yards of material hauled away, more than 99% of which was not within the ambit of the health mitigation order." (Ebert Decl. ¶ 28.)

After the Township maintenance workers departed on June 28, 2014, Mr. Ebert showed Sergeant Schroeder that the gate to the backyard fence had been broken, as breaks in the wood were fresh, the wooden cross-bar was removed, and the lock was missing. (Ebert Decl. ¶ 6.) The Township placed a lien on the Property in the amount of $3,639.20 for its costs with respect to the abatement action, as permitted by ordinance. (Defs.' SMF ¶ 23; *see also* Ebert Decl. ¶ 33 (noting the Township sold the lien to a third party).)

Mayor Yaede was not at the Property on June 28, 2014 and was not aware of the health violation abatement until after it occurred. (Defs.' SMF ¶¶ 30–31.) Plaintiffs assert that she was nevertheless already "aware of problems with the way Hamilton Township conducted remediations" at the time of the abatement. (Pls.' Resp. SMF ¶¶ 30 – 31.) On a separate occasion, Ms. Vares-Ebert had informed Mayor Yaede that Hamilton Township had improperly taken items of property, including vinyl siding, from the residence of Tammy Burnat. (*See*

---

[5] Plaintiffs repeatedly mention videos (*see, e.g.*, Pls.' Resp. SMF ¶ 30; Pls.' CMF ¶ 6; Ebert Decl. ¶¶ 9, 32), but no videos have been produced as part of the summary judgment record.

Vares-Ebert Decl. ¶¶ 5–11.) Mr. Ebert met Mayor Yaede for the first time at her deposition in this case. (Defs.' SMF ¶ 33; *see also* Ebert Decl. ¶¶ 40–43.)

On October 7, 2015, *pro se* Plaintiffs filed a complaint against the Township Defendant, Mayor Yaede, John Doe (I), and John Doe (II). (ECF No. 1.) Plaintiffs' Complaint alleges six causes of action, some of which include multiple sub-claims: (1) *Monell*[6] municipal liability claims against the Township Defendant under 42 U.S.C. § 1983, asserting violations of the Fourth Amendment proscription against unreasonable seizures, the right to procedural and substantive due process secured by the Fourteenth Amendment, failure to train, and Ms. Vares-Ebert's Sixth Amendment right to a speedy trial (Compl. ¶¶ 69–103); (2) claims against Mayor Yaede in her individual and official capacities under 42 U.S.C. § 1983, with the same predicate constitutional violations as alleged in Count One (*id.* ¶¶ 104–26); (3) a second *Monell* claim against the Township Defendant for a separate procedural due process violation based on actions taken after the June 28, 2014 incident (*id.* ¶¶ 127–43); (4) conspiracy under 42 U.S.C. § 1985 against all Defendants (*id.* ¶¶ 144–45); (5) a third *Monell* claim against the Township Defendant alleging violation of the Excessive Fines Clause of the Eighth Amendment (*id.* ¶¶ 146–48); and (6) claims under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 *et seq.*, for identical violations of the U.S. Constitution, in particular Fourth Amendment unreasonable seizure and Fourteenth Amendment procedural due process (*id.* ¶¶ 149–55).

After the close of discovery, Defendants moved for summary judgment on June 8, 2018. (ECF No. 74.) On June 18, 2018, Plaintiffs moved to dismiss Defendants' Motion for Summary Judgment because Defendants had not submitted a separate statement of undisputed material facts in keeping with Local Civil Rule 56.1. (ECF No. 75.) The Court denied Plaintiffs' motion

---

[6] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).

but granted the alternative relief of a single-cycle adjournment. (ECF No. 77.) Defendants

submitted a statement of facts (ECF No. 76), and Plaintiffs submitted a responsive statement of

facts (ECF No. 78). Plaintiffs timely opposed Defendants' Motion for Summary Judgment on

July 2, 2018, including a counterstatement of facts in dispute. (ECF No. 79 (filed on the docket

7/5/18)).[7] Defendants timely replied. (ECF No. 82.) The Court now considers the Motion.

## LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead

a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under

the governing law." *Id.* In deciding the existence of a genuine dispute of material fact, a court's

role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility

should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307

n.2 (3d Cir. 1983); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). In resolving a motion

---

[7] Mr. Ebert filed a second declaration with Plaintiffs' opposition brief, regarding new events which transpired between the parties in June 2018. (*See* ECF No. 79-1.) Mr. Ebert filed another declaration on the same topic on July 13, 2018. (ECF No. 83.) Defense counsel asked the Court to strike this declaration and impose sanctions (ECF No. 84), as the Court had already denied Plaintiffs an opportunity to file a sur-reply (ECF No. 81). Mr. Ebert responded by letter, arguing that his most-recent declaration does not constitute a sur-reply. (ECF No. 85.) The Court has reviewed these materials and will take no further action with respect to them; Plaintiffs have not moved to amend their complaint to include new allegations about the events of 2018, and therefore the events described are beyond the Court's review on this Motion. However, sanctions are not warranted. Mr. Ebert also filed a Rule 56(d) declaration arguing that insufficient discovery in this matter precludes summary judgment. (ECF No. 79-2); *see, e.g.*, *Malouf v. Turner*, 814 F. Supp. 2d 454, 459 (D.N.J. 2011). This declaration largely reiterates previously denied requests for a Rule 30(b)(6) deponent (*see, e.g.*, ECF Nos. 35, 43, 44, 61, 62, 67, 68). This declaration does not justify postponing summary judgment review.

for summary judgment, a district court considers the facts drawn from "materials in the record," including depositions, documents, affidavits, and declarations. Fed. R. Civ. P. 56(c)(1)(A).

The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. However, "[s]ummary judgment is inappropriate if an issue depends upon the credibility of witnesses, because credibility can best be determined only after the trier of fact observes the witnesses' demeanor." *Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1492 n.17 (3d Cir. 1985), *judgment vacated*, 475 U.S. 1105 (1986).

## ANALYSIS

Defendants seek to "dismiss all claims within Plaintiffs' Complaint, with prejudice." (Defs.' Br. at 2, ECF No. 74-1.) As an initial matter, the Court notes that Defendants describe Count One as a *Monell* claim predicated on a Fourth Amendment violation and largely limit their discussion to Fourth Amendment arguments. (*See* Defs.' Br. at 1, 10–15; *see also* Compl. ¶¶ 77–82.) However, bearing in mind the need to liberally construe pleadings prepared by *pro se* parties, *see, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Court reads the first cause of action to extend to additional alleged underlying constitutional violations, including Fourteenth Amendment procedural and substantive due process claims premised on deprivations of liberty and property (Compl. ¶¶ 79, 83–92), a claim for failure to train brought against the Township and Mayor Yaede (*id.* ¶¶ 93–98), and a Sixth Amendment speedy trial claim on behalf of Ms. Vares-Ebert (*id.* ¶¶ 99–103). (*See* Pls.' Br. at 13, ECF No. 79.) Defendants do not address these remaining claims, and the claims have not been previously dismissed.

Though all of these claims arise under § 1983, the claims are distinct, as § 1983 itself creates no substantive rights. *Ferreira v. Town of East Hampton*, 56 F. Supp. 3d 211, 222 (E.D.N.Y. 2014). "Certain wrongs affect more than a single right and, accordingly, can implicate

more than one of the Constitution's commands." *Soldal v. Cook County*, 506 U.S. 56, 70 (1992) (distinguishing *Graham v. Connor*, 409 U.S. 386, 394–95 (1989)); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–52 (1993). Courts must therefore analyze the constitutional claims in sequence. However, when a specific constitutional amendment "provides an explicit textual source of constitutional protection" for a plaintiff's claim, courts must analyze that constitutional claim under the specific amendment instead of the "generalized notion" of substantive due process. *Graham*, 490 U.S. at 395; *Albright v. Oliver*, 510 U.S. 266, 273 (1994).

Here, Plaintiffs' substantive due process claims regarding deprivation of property rely on factual allegations identical to Plaintiffs' Fourth Amendment unreasonable seizure claims. Therefore, "the Fourth Amendment, 'not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (quoting *Graham*, 490 U.S. at 395), *cert. denied sub nom.*, 138 S. Ct. 1263 (2018). Accordingly, summary judgment is granted in favor of Defendants on Plaintiffs' substantive due process claims premised on deprivation of property in Counts One and Two, because they are duplicative of Plaintiffs' Fourth Amendment claims. Further, the Court notes that "failure to train" is not a cognizable constitutional violation, but rather a theory of liability in § 1983 actions. *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001) ("[S]uch liability arises 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [government officials] come into contact.'" (citation omitted)). Accordingly, the Court will review this theory in its constitutional analyses, *infra*.

The remaining claims in Count One—Fourteenth Amendment substantive due process claims on deprivation of liberty, Fourteenth Amendment pre-deprivation procedural due process, and Sixth Amendment speedy trial—are not duplicative of the Fourth Amendment property seizure claim. Because Defendants make arguments about the adequacy of post-deprivation

procedural due process (*see* Defs.' Br. at 24–26), the Court will discuss the pre-deprivation procedures when addressing those claims. However, as Defendants have not articulated a basis for entering judgment in their favor on the remaining claims, the Fourteenth Amendment deprivation of liberty (which ultimately will be analyzed pursuant to Fourth Amendment seizure of a person doctrine) and Sixth Amendment speedy trial[8] claims shall proceed.

I.     Municipal Liability Under 42 U.S.C. § 1983 (Counts One, Three, and Five)

"Under Section 1983, a plaintiff must plead a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Harley v. City of New Jersey City*, 2017 WL 2779466, at *9 (D.N.J. June 27, 2017) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008)). "A local government may be sued under § 1983 only for acts implementing an official policy, practice or custom." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) (citing *Monell*, 436 U.S. at 690–91); *see also Watson v. Abington Township*, 478 F.3d 144, 155 (3d Cir. 2007). *Monell* provides that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691; *id.* at 694. Rather, liability "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). In sum, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

Plaintiffs make a facial attack on the Township Defendant's municipal ordinances as well as an "as applied" challenge based on the Defendant's enforcement conduct on June 28, 2014;

---

[8] The Court notes that Plaintiffs will have to surmount a number of hurdles to pursue a Sixth Amendment Speedy Trial claim through the vehicle of § 1983. *See, e.g.*, *Posey v. Swissvale Borough*, 2013 WL 989953, at *12–13 (W.D. Pa. Mar. 13, 2013).

Plaintiffs allege that Defendants' policy of summary nuisance abatement under 110-34, as written and as enforced, violates Plaintiffs' constitutional rights. Defendants have provided the ordinances that they believe gave them authority for their conduct and thereby concede that their employees were acting under color of state law and pursuant to an official municipal policy. (*See* Defs.' Br. at 11. *But see id.* at 14–15 (contesting *Monell* liability because municipality lacks custom or policy of making "unreasonable seizures" during health violation abatements).) The Court therefore turns to the alleged underlying constitutional violations.

A.    *Fourth Amendment Unreasonable Seizure (Count One)*

"Under the Fourth Amendment, a 'search' occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Gardner v. McGroarty*, 68 F. App'x 307, 311 (3d Cir. 2003) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Further, "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal*, 506 U.S. at 68. "A 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' Whether a government seizure violates the Fourth Amendment depends on its overall reasonableness, which must be based upon a 'careful balancing of governmental and private interests.'" *Duffy v. Kent Cty. Levy Court*, 591 F. App'x 41, 45 (3d Cir. 2014) (per curiam) (quoting *Soldal*, 506 U.S. at 61, 71). The curtilage, or area immediately surrounding the home, is entitled to the utmost Fourth Amendment protection. *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Under longstanding Supreme Court precedent, municipal searches of residential buildings for code violations typically require a warrant. *Camara v. Municipal Court*, 387 U.S. 523, 533 (1967). However, a warrant may not be required when the evidence of municipal code violations has already been obtained by means unchallenged by the plaintiff. *See, e.g.*, *Duffy*, 591 F. App'x

at 45 (affirming that warrantless seizure was reasonable because structures on the plaintiff's property posed a danger to the public, the defendants provided proper notice of the condemnation and demolition, and plaintiff could challenge the defendants' actions); *Gardner*, 68 F. App'x at 312 (finding the decision to condemn building for lack of heat constituted an "emergency" under the municipal housing code, and the emergency justified the warrantless seizure under the Fourth Amendment); *Ferreira*, 56 F. Supp. 3d at 230 (noting that the Fifth, Sixth, Eighth, and Tenth Circuit Courts of Appeals have held that government actors need not obtain a warrant before abating an established public nuisance); *Gariffo Real Estate Holdings Co. v. City of Philadelphia*, 2007 WL 1410607, at *5 (E.D. Pa. May 11, 2007) (finding no warrant was required for building seizure where collapsed outer wall was visible from the street).

Non-precedential Third Circuit decisions suggest there is no warrant requirement to abate an identified public nuisance, and instead courts should undertake a reasonableness analysis. *See, e.g.*, *Duffy*, 591 F. App'x at 45; *Gardner*, 68 F. App'x at 312; *see also Ferreira*, 56 F. Supp. 3d at 231 ("[T]he seizure of property considered to be a public nuisance, as well as the entry onto private property to accomplish that seizure, must still be reasonable to comply with the Fourth Amendment." (citing *Soldal*, 506 U.S. at 71)). In evaluating reasonableness, many courts partially collapse the Fourth Amendment analysis into a Fourteenth Amendment procedural due process analysis, because "a municipality's adherence to standards comporting with due process 'suggests the Fourth Amendment reasonableness' of the abatement." *Ferreira*, 56 F. Supp. 3d at 231 (quoting *Freeman v. City of Dallas*, 242 F.3d 642, 652–53 (5th Cir. 2001)).[9]

---

[9] Plaintiffs raise arguments regarding exceptions to the warrant requirement, namely exigent circumstances and community caretaking, but these Fourth Amendment doctrines are not the guiding analysis for a public nuisance abatement under Third Circuit case law and a vast body of persuasive authority. Though Plaintiffs raise concerns that the original notice they were issued fell under the Township's housing code, and was not explicitly a health code violation (*see* Pls.' Br. at 9, 18), the purpose of promoting public health, safety, and welfare is consistent across both

Plaintiffs argue that Defendants violated their Fourth Amendment rights to be free from unreasonable searches and seizures in entering the Property without a warrant, or a valid exception to the warrant requirement, and removing and/or destroying their personal property. Defendants argue that they were operating pursuant to lawful ordinances passed in keeping with the state's police power and that their warrantless summary abatement of a public nuisance to protect public health and safety is consistent with the Fourth Amendment. Importantly, Plaintiffs challenge the June 28, 2014 entry and seizure, not the initial Notice of Violation they received or Defendants' insistence that Plaintiffs clean up the Property. Therefore, Plaintiffs' reliance on *Camara* is misplaced, as *Camara* dealt with a wrongful warrantless initial inspection. Plaintiffs allege that Defendants violated their Fourth Amendment rights *after* Defendants had already determined the presence of nuisance conditions on Plaintiffs' property. However, the parties genuinely dispute, *inter alia*, how Defendants gained entry to the backyard on June 28, 2014 and the extent of the items seized. These genuinely disputed material facts bear on whether Defendants acted reasonably, preventing the Court from resolving the Fourth Amendment question. Summary judgment is denied on the Fourth Amendment claim in Count One.

B.    *Fourteenth Amendment Procedural Due Process (Counts One and Three)*

"To state a procedural due process claim, [a plaintiff] must establish (1) that it was deprived of an individual interest that is encompassed within the Fourteenth Amendment's

---

municipal codes, was mentioned in the Notice of Violation, and is well within the municipality's inherent police power, *see James v. Arms Tech., Inc.*, 820 A.2d 27, 47–48 (N.J. Super. Ct. App. Div. 2003) (collecting cases); *see also* N.J.S.A. 40:48-2. Plaintiffs' concern that Defendants are trying to pull a bait-and-switch by premising their abatement action on a different code provision post-facto is misplaced; the Notice of Violation made clear that a summary abatement pursuant to Hamilton Township ordinance 110-34 would follow if the conditions cited were not remedied by the homeowner. The Court's task, therefore, is to evaluate the reasonableness of the abatement action, and, as part of that evaluation, whether the municipality's procedures comported with due process, both as written and as carried out.

protection of life, liberty and property, and (2) that the procedures available to it did not provide due process of law." *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 62 (3d Cir. 2013). Plaintiffs' ownership of the Property is undisputedly a protected Fourteenth Amendment property interest. The question is whether Plaintiffs were afforded sufficient notice and opportunity to be heard. "That opportunity 'must be granted at a meaningful time and in a meaningful manner.' In the typical situation, the hearing should come before the Government deprives a person of his property." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Courts must balance three factors to determine whether the procedural protections were sufficient: (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value of different procedures; and (3) the government's interest. *See, e.g.*, *Nat'l Amusements Inc.*, 716 F.3d at 62 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 (3d Cir. 2013).

"[I]n special circumstances, a state may satisfy the requirements of procedural due process by making available 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.'" *Elsmere Park Club*, 542 F.3d at 417 (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)). Such "special circumstances" necessitate quick state action, where pre-deprivation process would be impractical. *Id.* In analyzing whether an emergency or special circumstances existed, the Third Circuit "look[s] to whether there was 'competent evidence' supporting the reasonable belief that the [] situation presented an 'emergency,' and to whether the Town's actions were otherwise 'arbitrary' or an 'abuse of discretion.'" *Id.* at 418. If the Township did not face "special circumstances," and should have provided a pre-deprivation hearing under *Mathews*, "then no amount of post[-]deprivation process could cure the [] initial failure to provide a hearing." *Id.* at 417. However, if special

circumstances existed which absolved the Township of providing a pre-deprivation hearing, "the question becomes whether it made adequate post[-]deprivation procedures available . . . ." *Id.*

Plaintiffs contend that the Township violated their due process rights in two ways: first, in failing to provide a pre-deprivation hearing (Count One), and, second, in providing inadequate means for challenging the seizure after it occurred, including by failing to respond to Plaintiffs' communications to the Township pursuant to the New Jersey Tort Claims Act ("NJTCA") (Count Three). (*See generally* Compl. ¶¶ 83–92, 127–43; *see also id.* ¶¶ 105–19 (describing the alleged procedural due process violation more thoroughly in claims against Defendant Yaede); Pls.' Br. at 3–4, 13–14, 21, 25–27.) The Township acknowledges that it did not provide a pre-deprivation hearing to Plaintiffs but responds that Plaintiffs were provided sufficient notice and time to comply (Defs.' Br. at 11–13; Defs.' Reply at 4–6) and that the Township is not obligated to respond to residents' letters (Defs.' Br. at 24–26; Defs.' Reply at 13–14).

The first question is whether the Township was justified in resorting to a summary abatement procedure under the doctrine of special circumstances. This analysis is complicated by the fact that it is not clear which procedures the Township invoked. (*See, e.g.*, Pls.' CMF ¶ 1; *see also Elsmere Park Club*, 524 F.3d at 418 n.5 (discussing how lack of clarity regarding ordinances relied on did not bear on the Third Circuit's procedural due process analysis because both ordinances provided authority). The Notice of Violation (Defs.' Ex. C), which was sent to Plaintiffs by certified mail (Defs.' Ex. D), cited violations of section 66-71 ("Disposal of garbage and trash; outside maintenance; parking of vehicles."), which appears in the Housing chapter of the Township Code (*see* Defs.' Ex. L), as well as the possibility of summary abatement pursuant to section 110-34 ("Cleaning of lot by township; recovery of costs."), which appears in the Property Maintenance chapter of the Township Code (*see* Defs.' Ex. R). Further, section 110-34 references section 110-33, stating:

> If the owner, tenant or person in possession of the lands in question shall refuse or neglect to abate or remedy the condition complained of within five days after receipt of notice pursuant to section 110-33, the enforcement officer shall issue a summons to the owner, tenant or person in possession for violation of this article and/or shall cause the condition complained of to be abated and remedied by the department of public works, which shall certify the cost thereof to the department of finance, who shall cause the cost as shown thereon to be charged against the lands.

Hamilton Township Code of Ordinances § 110-34. The notice required by section 110-33 requires an enforcement officer to notify the owner in writing, personally or by registered mail, to remove the items in violation within five days after receipt of notice to do so. *Id.* § 110-33.

Defendants argue that the ordinances cited in the Notice of Violation, as well as sections 110-32 and 110-33, gave the Township lawful authority to act without a hearing. (*See* Defs.' Br. at 11–13; Defs.' Reply at 4–6.) Only after multiple extensions over the course of four weeks and subsequent re-inspections in which the Township discovered lack of full compliance did the Township resort to summary abatement. In contrast, Plaintiffs emphasize that sections 110-32 and 110-33 were not cited in the Notice of Violation, and therefore even if those ordinances permitted the township to forgo a pre-deprivation hearing, the Notice was constitutionally deficient. (*See* Pls.' Br. at 13–14.)[10] Further, Plaintiffs argue that reliance on section 66-71 entitled Plaintiffs to the procedures in section 66-66, which governs issuance of notices and summonses for housing code violations. (*See* Pls.' Br. at 3–4, 13–14, 25–26; *see also* Pls.' Ex. 1 (excerpts from section 66-66).) Finally, Plaintiffs argue that "[i]f Hamilton really believed there was a hazardous nuisance, they would not have waited a month to abate it." (Pls.' Br. at 9.)

---

[10] The Court is not persuaded by Plaintiffs' additional argument that the fact that the Township sent the Notice of Violation by certified mail, not registered mail, violated their procedural due process rights. (*See, e.g.*, Ebert Decl. ¶¶ 18 – 19; Pls.' Br. at 3–4.) As the Township noted, under New Jersey law, "[t]he words 'registered mail' include 'certified mail.'" (Defs.' Reply at 5 n.1 (citing N.J.S.A. 1:1-2).) Further, the fact that Plaintiffs received and acted upon the notice, even securing extensions for compliance, implies that the notice was effective. (*Id.* at 5–6.)

All told, the Court is persuaded that, like in *Elsmere Park Club*, the dispute about which ordinance(s) governed is not dispositive. Plaintiffs were advised in the Notice of Violation that, unless they complied with the Township's order to rectify the cited conditions, the Township would issue a work order under section 110-34. That ordinance, in turn, spelled out the Township's underlying authority under 110-33. The notice provided to Plaintiffs was not constitutionally deficient. However, unlike in *Elsmere Park Club*, here "there is a disputed issue of fact as to whether the defendants acted arbitrarily in deciding that the conditions on the Property posed an immediate danger to the public." *Ferreira*, 56 F. Supp. 3d at 228. This dispute prevents the Court from determining whether special circumstances existed, which would excuse a pre-deprivation hearing. The Court does not reach the Township's post-deprivation remedy because the inquiries regarding pre-deprivation and post-deprivation due process are inherently tied; if it is determined that pre-deprivation process was required, and therefore the Fourteenth Amendment was violated, the Court need not reach the adequacy of the post-deprivation process. Summary judgment is denied on the procedural due process claims in Counts One and Three.

      C.    *Eighth Amendment Excessive Fine (Count Five)*

"By its plain language, the Excessive Fines Clause of the Eighth Amendment is violated only if the disputed fees are both 'fines' and 'excessive.'" *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 420 (3d Cir. 2000). "The term 'fine' refers to punishment for a criminal offense." *Id.* (citing *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)). To be considered a fine under the Eighth Amendment, a monetary charge must be punitive in character. *Id.* (noting that district court wrestled with factual question of whether prison program which imposed fees had rehabilitative or punitive purpose); *see also Austin v. United States*, 509 U.S. 602, 607–11 (1993) (extending the Excessive Fines Clause to *in rem* civil forfeiture, where the forfeiture acts as a punishment).

Plaintiffs claim that the charges and lien are an excessive fine, in violation of the Eighth Amendment, but have not introduced any evidence to suggest that the charges operated as punishment for an offense. (*See* Pls.' Br. at 23–25 (arguing that the amount charged was excessive, but making no arguments or evidentiary references that the fee constituted a punitive fine within the meaning of the Eighth Amendment).) In reply, Defendants argue that the charges seek "reimbursement for expenses incurred to remove the junk and trash from the Property," and therefore do not fall within the meaning of the Excessive Fines Clause. (Defs.' Reply at 12, ECF No. 82; *see also* Defs.' Br. at 21–23.) While the Excessive Fines Clause may have teeth in certain civil contexts, it simply is inapplicable to the circumstances here, where the cost imposed is not intended as punishment for an offense. Therefore, the Court need not evaluate the alleged excess of the charge, since it does not constitute a "fine" for the purposes of the Eighth Amendment. As a New Jersey state court has recognized, "There is no constitutional impediment to making a landowner personally responsible for the reasonable cost of abating hazardous conditions existing on his property." *City of Paterson v. Fargo Realty Inc.*, 415 A.2d 1210, 1214 (N.J. Dist. Ct. 1980); *see also In re Lead Paint Litig.*, 924 A.2d 484, 498 (N.J. 2007) ("[H]istorically [the right to abate] has included the right to visit upon the owner of the land from which the public nuisance emanates, the obligations, including the costs, of the abatement . . . ."). Summary judgment is granted to Defendants on Count Five.

II.     Individual Liability Under 42 U.S.C. § 1983 (Count Two)

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). A plaintiff must allege that the individual defendant violated their constitutional rights personally or through direction of subordinates, actual knowledge, or acquiescence in constitutional violations. *Id.*; *see also Santiago v.*

*Warminster Township*, 629 F.3d 121, 129 (3d Cir. 2010). Alternatively, "a supervisor may be liable under § 1983 if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 72 (3d Cir. 2011). Further, a supervisor may be liable on a theory of failure to train when said failure amounts to "deliberate indifference" to others' constitutional rights. *Brown*, 269 F.3d at 215; *see also Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) ("[F]ailure to train . . . [is] generally considered a subcategory of policy or practice liability."), *cert. granted, judgment rev'd sub nom. on other grounds*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015).

Defendants argue that Mayor Yaede is not liable for any of the alleged constitutional violations because (i) she had no personal involvement with the Notice of Violation and abatement effort on June 28, 2014 and, regardless, (ii) she is entitled to qualified immunity. (Defs.' Br. at 15–19.) Plaintiffs concede that Defendant Yaede was not involved in issuing or resolving the Notice of Violation and not present on June 28, 2014. (*See* Pls.' Br. at 14 ("That Mayor Yaede did not individually issue the Notice or the abatement order does not end the inquiry.").) However, they argue that Mayor Yaede is liable because (i) she had knowledge of and the opportunity to veto the complained-of ordinances (Pls.' Br. at 14); (ii) she had constructive notice of problematic remediations based on two past incidents not involving Plaintiffs, one in 2013 and one in or around 2001 (*id.* at 14–15, 26–27); and (iii) she is the chief executive of the Township (*id.* at 16). Plaintiffs have not adduced evidence to raise a genuine dispute of material fact as to Mayor Yaede's supervisory role or actual knowledge of, acquiescence to, or oversight of unconstitutional conduct. Therefore, Plaintiffs cannot maintain a § 1983 claim against Defendant Yaede. *See, e.g.*, *Cowles v. City of Elizabeth*, 612 F. App'x 70,

72 (3d Cir. 2015) (per curiam). The Court need not reach the question of qualified immunity. Summary judgment is granted to Defendant Yaede on Count Two.

III.   Conspiracy Under 42 U.S.C. § 1985 (Count Four)

To sufficiently plead a § 1985(3) conspiracy claim, a complaint must plausibly allege:

> (1) a conspiracy; (2) for the purpose of depriving a person or class of persons equal protection under the law or equal privileges and immunities under the law; (3) an act in furtherance of the conspiracy; and (4) injury to a plaintiff's property or his person, or deprivation of a right or privilege of a U.S. citizen.

*McArdle v. Hufnagel*, 588 F. App'x 118, 120 (3d Cir. 2014) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)); *see Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). Section 1985(3) actions are limited to conspiracies predicated on "racial, or perhaps otherwise class based, invidiously discriminatory animus." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *see also Farber*, 440 F.3d at 135 ("[A] plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious."). In addition, a claim for conspiracy "must . . . contain supportive factual allegations." *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 484 (D.N.J. 2009) (quoting *Rose v. Bartle*, 871 F.2d 331, 336 (3d Cir. 1989)). "Mere conclusory allegations that a conspiracy exists will not survive . . . ." *Harley*, 2017 WL 2779466, at *11 (citing *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 605 (D.N.J. 2002)).

Plaintiffs' § 1985(3) conspiracy claim is short on details, stating only "The named defendants conspired to seize and remove property and deny liberty interests in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution." (Compl. ¶ 145.) While the lack of supportive factual allegations alone supports Defendants' Motion, the fact that Plaintiffs' Complaint fails to allege that Defendants' conduct was predicated on any kind of class-based animus, racial or otherwise, is also fatal to their claim.

In opposition to Defendants' Motion, Plaintiffs "move under FRCP 56(d) to seek discovery of facts which would prove the claim, with a declaration accompanying this filing of July 2, 2018." (Pls.' Br. at 22–23.) The referenced declaration states, "Particular information sought is the nature of the impact of the removals on residents in the Bromley section of Hamilton Township, which is disproportionality [sic] African-American compared to other sections of Hamilton Township, thus implication [sic] the equal protection clause of the 14th Amendment." (Ebert Rule 56(d) Decl. ¶ 5, ECF No. 79-2; *see also id.* ¶¶ 6–7.) This new post-discovery effort is insufficient to defeat summary judgment, as Plaintiffs have never alleged a race-based conspiracy motivated Defendants' conduct. Summary judgment is granted to Defendants on Count Four.

IV.     Claims Under the NJCRA (Count Six)

Much like the vehicle of § 1983, the NJCRA creates a private right of action against a "person acting under color of law" for violations of the federal and New Jersey constitutions. N.J.S.A. 10:6-2; *see, e.g.*, *Szemple v. Corr. Med. Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012) (per curiam) ("The NJCRA is interpreted as analogous to § 1983."); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). The Court reads Count Six to assert two federal claims under the NJCRA: violation of the Fourth Amendment right to be free from unreasonable searches and seizures as well as violation of Fourteenth Amendment procedural due process before and after the June 28, 2014 incident.

Though neither party has addressed this point, the Court notes that the NJCRA does not create a private right of action to pursue a claim for a violation of procedural due process. *Mattson v. Aetna Life Ins. Co.*, 124 F. Supp. 3d 381, 390 (D.N.J. 2015) (quoting *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 405 (D.N.J. 2011)), *aff'd*, 653 F. App'x 145 (3d Cir. 2016). Therefore, summary judgment is entered in favor of Defendants on the procedural due process

claim in Count Six (Compl. ¶ 153 (noting lack of pre-deprivation hearing); *id.* ¶ 154 (asserting that Township's implementation of NJTCA violates procedural due process)). However, summary judgment is denied on the Fourth Amendment claim against the Township Defendant in Count Six, in keeping with the Court's analysis in part I.A., *supra*. To the extent Count Six is asserted against Defendant Yaede, summary judgment is granted to Defendant Yaede in keeping with the Court's analysis in part II, *supra*.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. An appropriate order will follow.

Date:  August 9, 2018                                  */s/ Anne E. Thompson*
                                                      ANNE E. THOMPSON, U.S.D.J.